UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
DENNIS WYSOCKI & LISA WYSOCKI,

               Plaintiffs,                         **MEMORANDUM
AND ORDER**
23-CV-8790-SJB-AYS

      v.

NASSAU COUNTY, et al.,

               Defendants.
---------------------------------------------------------------X

**BULSARA, United States District Judge:**

Plaintiffs Dennis and Lisa Wysocki filed this lawsuit alleging that Nassau County, Police Commissioner Patrick Ryder, Lieutenant Marc Timpano, and Officer Vito Scaglione violated their Second Amendment rights by imposing substantial conditions on the return of their firearms after they were seized, and suspending their pistol licenses, in response to their daughter's mental health crises. (Compl. filed Nov. 29, 2023, Dkt. No. 1). The Wysockis seek summary judgment on their Second Amendment and *Monell* claims. (Pls.' Mem. in Supp. of Mot. for Summ. J. dated Sep. 8, 2025 ("Pls.' Mot."), Dkt. No. 32-16). For the reasons explained, the motion is granted in part and denied in part.

<u>STANDARD FOR SUMMARY JUDGMENT</u>

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury

could return a verdict for the nonmoving party.'"  *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113 (2d Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "In determining whether summary judgment is appropriate, [the Court] must resolve all ambiguities and draw all reasonable inferences against the moving party."  *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the burden of "demonstrat[ing] the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323.  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" in one of two ways.  Fed. R. Civ. P. 56(c)(1).  It may cite to portions of the record "including depositions, documents, electronically stored information, affidavits or declarations, . . . admissions, interrogatory answers, or other materials."  *Id.* R. 56(c)(1)(A).  Alternatively, it may show that "the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  *Id.* R. 56(c)(1)(B); *cf. Farid v. Smith*, 850 F.2d 917, 924 (2d Cir. 1988).

In moving for summary judgment or answering such a motion, litigants are required by the Local Rules to provide a statement (a Rule 56.1 statement) setting forth purported undisputed facts or, if controverting any fact, responding to each assertion. *See* Loc. Civ. R. 56.1(a)–(b).  In both instances, the party must support its position by citing to admissible evidence from the record.  *Id.* R. 56.1(d); *see also* Fed. R. Civ. P. 56(c) (requiring reliance on admissible evidence in the record in supporting or controverting a purported material fact).  "The purpose of Local Rule 56.1 is to streamline the

2

consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001).

Where claims in opposing Rule 56.1 statements are "genuinely disputed," the Court will consider the evidentiary sources of the claims. *Halberg v. United Behav. Health*, 408 F. Supp. 3d 118, 146 (E.D.N.Y. 2019) (adopting report and recommendation). In evaluating the sources of claims made in dueling Rule 56.1 statements, the Court cannot—as is true for the summary judgment motion as a whole—weigh evidence or assess the credibility of witnesses. *See United States v. Rem*, 38 F.3d 634, 644 (2d Cir. 1994). Furthermore, "[l]egal arguments are impermissible in any Rule 56.1 Statement and are to be disregarded." *Taveras v. HRV Mgmt., Inc.*, No. 17-CV-5211, 2020 WL 1501777, at *2 (E.D.N.Y. Mar. 24, 2020); *Lawrence v. Cont'l Cas. Co.*, No. 12-CV-412, 2013 WL 4458755, at *1 n.1 (E.D.N.Y. Aug. 16, 2013) ("Both parties have submitted Local Rule 56.1 statements and responses to each other's statements that mix factual assertions with legal argument and therefore fail to meet the requirements of Local Rule 56.1. The facts . . . are taken from those assertions contained in the Local Rule 56.1 statements that comply with Local Rule 56.1[.]" (citations omitted)). The court may not grant summary judgment based on a fact in a Rule 56.1 statement—even if undisputed—not supported by admissible evidence. *E.g.*, *Giannullo v. City of New York*, 322 F.3d 139, 142–43 (2d Cir. 2003) (vacating grant of summary judgment to defendants based on facts enumerated in Rule 56.1 statement supported only by arguments in briefs rather than admissible evidence). The Court must also disregard conclusory denials that lack citations to

admissible evidence.  *Rodriguez v. Schneider*, No. 95-CV-4083, 1999 WL 459813, at *1 n.3 (S.D.N.Y. June 29, 1999) ("*Rule 56.1 statements are not argument.  They should contain factual assertions, with citation to the record.  They should not contain conclusions[.]*"), *aff'd*, 56 F. App'x 27, 29 (2d Cir. 2003).  Also, where the opposing party fails to specifically controvert a numbered paragraph in the Rule 56.1 statement, the statement by the moving party "will be deemed to be admitted."  Loc. Civ. R. 56.1(c).  The Court also does not give any consideration to hearsay, speculation, or inadmissible evidence in evaluating declarations or affidavits.  *Pacenza v. IBM Corp.*, 363 F. App'x 128, 130 (2d Cir. 2010) ("[A] court is obliged not to consider inadmissible evidence at the summary judgment stage[.]"); *Crawford v. Dep't of Investigation*, No. 05-CV-5368, 2007 WL 2850512, at *2 (S.D.N.Y. Oct. 1, 2007) ("[A] non-moving party 'must set forth specific facts showing that there is a genuine issue for trial;' he or she 'may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful.'" (quoting *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005))), *aff'd*, 324 F. App'x 139, 143 (2d Cir. 2009).

FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The Court finds the following facts relevant to its decision—drawn from the pleadings, the parties' respective Rule 56.1 statements, and supporting affidavits and exhibits attached thereto—are undisputed unless otherwise noted.[1]

Dennis and Lisa Wysocki were issued New York State pistol licenses by the Nassau County Police Department's ("NCPD") Pistol License Section ("PLS") in September 2017 and February 2021 respectively.  (Pls.' 56.1 Statement dated Sep. 8, 2025 ("Pls.' 56.1 Stmt."), Dkt. No. 32-1 ¶¶ 4–5; Defs.' Resp. 56.1 Statement dated Dec. 1, 2025 ("Defs.' Resp. 56.1 Stmt."), Dkt. No. 38-1 ¶¶ 4–5).  In 2022, both applied for and were issued unrestricted concealed-carry pistol licenses.  (Defs.' Statement of Additional Facts dated Dec. 1, 2025 ("Defs.' 56.1 Stmt."), Dkt. No. 38-1 ¶¶ 129–30; Pls.' Resp. to Defs.' 56.1 Stmt. dated Dec. 22, 2025 ("Pls.' Resp. 56.1 Stmt."), Dkt. No. 39-1 ¶¶ 129–30).

The Wysockis live with their minor daughter, who was in middle school in February 2023.  (Id. ¶ 131; Defs.' 56.1 Stmt. ¶ 131).  On February 8, 2023, their daughter told a school counselor she had been feeling depressed and described past thoughts of harming herself using a rope.  (Id. ¶ 132; Pls.' Resp. 56.1 Stmt. ¶ 132).  The counselor asked her if there were firearms in the home, and she confirmed their presence.  (Id. ¶ 133; Defs.' 56.1 Stmt. ¶ 133).

---

[1] Defendants' response to the Wysockis' Rule 56.1 Statement does not include any citation to evidence and makes solely legal arguments and speculation.  The Court ignores these responses since they are improper and invalid bases to raise disputed issues of fact.  *See* Loc. Civ. R. 56.1(d).

On February 10, 2023, the Wysockis took their daughter to the Cohen Children's Medical Center.  She was evaluated by psychiatrist Dr. Joshua Stein who concluded she "does not represent an imminent danger to self or others" and could return home.  (*Id.* ¶¶ 134–35; Pls.' Resp. 56.1 Stmt. ¶¶ 134–35).  On February 11, 2023, Child Protective Services ("CPS") caseworkers and NCPD officers visited the Wysockis' home in response to the school report.  (*Id.* ¶ 136; Defs.' 56.1 Stmt. ¶ 136).  The NCPD officers examined their gun safes, confirming that the firearms were stored in locked safes with trigger locks.  (*Id.* ¶ 137; Pls.' Resp. 56.1 Stmt. ¶ 137).

On February 13, 2023, Dennis Wysocki called the PLS and spoke with Officer Vito Scaglione ("Scaglione") to report his daughter's comments and the visit from the police.  He relayed that the officers had examined the safes, confirmed that their firearms were properly stored, and that his daughter had been evaluated and discharged by Dr. Stein as not an imminent danger to herself or others.  (*Id.* ¶¶ 139–40; Defs.' 56.1 Stmt. ¶¶ 139–40).  During the phone call, Scaglione informed Dennis that their pistol licenses were going to be suspended given their daughter's expressed thoughts of self-harm and that they would have to surrender their guns.  (Pls.' 56.1 Stmt. ¶¶ 42–43 (citing Decl. of Dennis Wysocki ("Dennis Decl."), attached to Pls.' Mot., Dkt. No. 32-2 ¶ 16; Dep. of Vito Scaglione ("Scaglione Dep."), attached to Decl. of Amy L. Bellantoni ("Bellantoni Decl.") as Ex. 2, Dkt. No. 32-11 at 26:24–27:5 ("So because of what was said, I wanted them to come to the pistol license section and I wanted to speak with them about what occurred and they were going to get suspended and I wanted to confiscate their weapons.")))  That same day, the Wysockis took their

firearms to a federal firearms licensee for safekeeping and went to the PLS office to provide Scaglione with a receipt confirming this transfer. (Defs.' 56.1 Stmt. ¶¶ 141–42; Pls.' Resp. 56.1 Stmt. ¶¶ 141–42).

Scaglione instructed the Wysockis to prepare written statements. (Pls.' 56.1 Stmt. ¶ 53; Defs.' Resp. 56.1 Stmt. ¶ 53). He also gave them each a "Notification of Pistol License Suspension" stating that their pistol licenses had been suspended in accordance with New York Penal Law § 400.00 and the PLS Handbook Chapter 1, §§ I(1) and I(2). (Defs.' 56.1 Stmt. ¶ 143; Pls.' Resp. 56.1 Stmt. ¶ 143). The Notices advised them that the PLS would investigate the suspensions and during that period they were required to surrender their guns. (*Id.* ¶¶ 143–44; Defs.' 56.1 Stmt. ¶¶ 143–44).

Chapter 1, Section I of the PLS Handbook states:

> Pursuant to NYSPL § 400.00(11), a pistol license issued by the Nassau County Police Department may be revoked and cancelled by the Commissioner of Police *at any time*. Furthermore, a person whose pistol license is suspended or revoked for any reason is required to surrender their license and firearms, *including their rifles and shotguns*, to the NCPD Pistol License Section.

(PLS Handbook Revised Feb. 2023 ("PLS Handbook"), attached to Bellantoni Decl. as Ex. 1, Dkt. No. 32-10 Ch. 1 § I).[2] Subsection 1 details circumstances for automatic revocation including when a licensee is convicted of a felony or deemed mentally unfit. (*Id.* § I(1)). Subsection 2 provides for discretionary revocation: a pistol license "may be suspended and/or revoked based upon evidence of any disqualification pursuant to

---

[2] Plaintiffs also submit the 2016 version of the PLS Handbook, (PLS Handbook Revised June 10, 2016, attached to Bellantoni Decl. as Ex. 5, Dkt. No. 32-14), but there is no meaningful difference in the relevant language.

7

this Handbook or applicable law." (*Id.* § I(2)).  It is NCPD policy to "*immediately suspend the pistol license of any licensee who violates any of the terms and conditions of the license or [the] Handbook and commence an investigation to determine whether or not the license should be revoked.*" (*Id.*).[3]

The PLS Handbook requires a report to the PLS when "the licensee or a member of the licensee's household receives professional treatment for mental health issues (including depression)" or is admitted to a hospital for mental-health treatment.  (PLS Handbook, Ch. 2 §§ F(13)–(14)).  Lieutenant Marc Timpano testified that PLS officers have discretion when deciding whether to suspend a pistol license, and that PLS uses the Handbook as a "guide" when making suspension determinations, including whether to act after reports of a mental health incident.  (Defs.' 56.1 Stmt. ¶¶ 153–54; Pls.' Resp. 56.1 Stmt. ¶¶ 153–54).

The Wysockis submitted the statements explaining the incident with their daughter, along with Dr. Stein's letter on February 14, 2023.  (*Id.* ¶¶ 144, 146–47; Defs.' 56.1 Stmt. ¶¶ 144, 146–47).  They then submitted on April 18, 2023 a letter from CPS that the investigation was closed as "unfounded."  (*Id.* ¶ 148; Pls.' Resp. 56.1 Stmt. ¶ 148).  Scaglione instructed them to provide a letter from their daughter's treating doctor stating that it was safe for her to live in a home where guns are kept, (Pls.' 56.1 Stmt.

---

[3] Section I(2) provides a non-exhaustive list of the violations of the terms and conditions of the pistol license that may lead to suspension, including improper use, (PLS Handbook, Ch. 1 § I(2)(e)), or failure to comply with any regulations in the Handbook, (*id.* § I(2)(z); *see also id*. Ch. 2 § C).

¶ 56), and that he would continue the investigation and would see them "in about 8–12 months," (Defs.' 56.1 Stmt. ¶ 149; Pls.' Resp. 56.1 Stmt. ¶ 149).

In June 2023, Dennis informed the PLS that they were unable to obtain a letter from a doctor stating that it was safe for their daughter to live in a home with firearms. (*Id.* ¶ 150; Defs.' 56.1 Stmt. ¶ 150).  The Wysockis maintain that Scaglione informed them that even with such a letter, their licenses would not be reinstated until they purchased two biometric safes, which they have no intention of purchasing, and that if their daughter "ever did anything like this again" they would never have their licenses returned.  (Pls.' 56.1 Stmt. ¶¶ 67–69).  The Wysockis' pistol licenses remain in suspended status and the PLS investigation remains open.  (Defs.' 56.1 Stmt. ¶ 156; Pls.' Resp. 56.1 Stmt. ¶ 156).

The Wysockis commenced this action on November 29, 2023.  (Compl.).[4]  The Complaint asserts three causes of action: (1) violation of the Second and Fourteenth Amendments pursuant to 42 U.S.C § 1983, (2) violation of the Fourth Amendment pursuant to § 1983,[5] and (3) a *Monell* claim against Nassau County.  (*Id.* ¶¶ 114–19). Aside from the immediate reinstatement of their licenses and return of their firearms, the Wysockis also seek declaratory relief holding that the Nassau County policies and procedures challenged, including the PLS Handbook, violate the Constitution, and a permanent injunction barring their use.  (*Id.* at 16).  The parties completed briefing on

---

[4] The case was transferred from the Honorable Gary R. Brown to the undersigned on January 8, 2025.

[5] The Wysockis do not seek summary judgment on their Fourth Amendment claim.

the Wysockis' motion for summary judgment on December 22, 2025.  (Pls.' Mot.; Defs.'

Mem. in Opp'n to Pls.' Mot. dated Dec. 1, 2025 ("Defs.' Opp'n"), Dkt. No. 38; Pls.' Reply

in Further Supp. of Pls.' Mot. dated Dec. 22, 2025 ("Pls.' Reply"), Dkt. No. 39).

DISCUSSION

## I.      Second Amendment Violation

The Second Amendment provides: "A well regulated Militia, being necessary to

the security of a free State, the right of the people to keep and bear Arms, shall not be

infringed."  U.S. Const. amend. II.  Thus an individual has a constitutional "right to

keep and bear arms."  *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008).[6]  In *New*

*York State Rifle & Pistol Association v. Bruen*, the Supreme Court set forth a two-step

framework for determining whether a law regulating the possession of a weapon

violates an individual's Second Amendment rights.  *See* 597 U.S. 1, 19–24 (2022);

*Antonyuk v. James*, 120 F.4th 941, 964 (2d Cir. 2024).

At step one, the plaintiff bears the initial burden of establishing that the Second

Amendment's plain text covers an individual's conduct, and if it does, the Constitution

presumptively protects that conduct.  *See Antonyuk*, 120 F.4th at 964; *see also Calce v.*

*Tisch*, No. 25-0861, 2026 WL 980092, at *1 (2d Cir. Apr. 13, 2026) (noting that at step one,

courts consider "whether the conduct at issue implicates the right to armed self-

defense").  Then at step two, the burden shifts, and the "government must . . . justify its

regulation by demonstrating that it is consistent with the Nation's historical tradition of

---

[6] The Second Amendment applies to the states via the Fourteenth Amendment. *See McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010).

10

firearm regulation."  *Antonyuk*, 120 F.4th at 964 (quotation omitted); *see also United States v. Simmons*, 150 F.4th 126, 130 (2d Cir. 2025) ("To meet this burden, the government must identify a well-established and representative historical analogue to the challenged regulation." (quotation omitted)).  "Stated differently, 'the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.'"  *Antonyuk*, 120 F.4th at 964 (quoting *Bruen*, 597 U.S. at 19).

Defendants do not make any argument about step one—whether the Wysockis' conduct is protected by the Second Amendment—nor could they.  The Second Amendment protects an "individual's right to possess a handgun in the home for self-defense."  *Zherka v. Bondi*, 140 F.4th 68, 75 (2d Cir. 2025) (quotation omitted).  And that is among the legal and protected reasons the Wysockis possessed their firearms.  (*E.g.*, Decl. of Lisa Wysocki, attached to Pls.' Mot., Dkt. No. 32-6 ¶ 17 (indicating they possess "handguns, rifles, [and] shotguns for home defense, target shooting [and] hunting"));  *see Nastri v. Dykes*, 807 F. Supp. 3d 112, 135 (D. Conn. 2025) (finding plaintiff met his burden where there was "no dispute of material fact that [plaintiff] is a law-abiding, adult citizen who seeks to carry a weapon that is in common use in public for the purposes of self-defense"), *appeal docketed*, No. 25-2413 (2d Cir. Oct. 2, 2025).

Turning to step two, as applied to the Wysockis, the Defendants have failed to meet their burden.  Under this inquiry, a court "must ascertain whether the [challenged] new law is relevantly similar to laws that our tradition is understood to permit, applying faithfully the balance struck by the founding generation to modern

11

circumstances." *Frey v. City of New York*, 157 F.4th 118, 127 (2d Cir. 2025) (quoting

*United States v. Rahimi*, 602 U.S. 680, 692 (2024)).

Defendants present *zero* evidence that the PLS's actions are consistent with the

Nation's historical tradition of firearm regulation.  They provide no citation to law,

tradition, or any other evidence, nor do they provide a particular historical analogy to

match the practices employed against the Wysockis.  Instead, they rely on *Rahimi*,

which is inapposite.

*Rahimi* addressed the constitutionality of 18 U.S.C. § 922(g)(8), which disarms

individuals subject to certain domestic violence protective orders.  602 U.S. at 684–85.

The Supreme Court upheld the provision based on a historical tradition of disarming

individuals that pose a clear threat of physical violence to another person.  *Id.* at 698.

Defendants contend that the founding-era surety and going-armed laws in *Rahimi*

establish a more general principle: the government may act in a "targeted and time-

limited way, based on reliable evidence of dangerousness, to prevent serious harm

while the risk is appropriately managed."  (Defs.' Opp'n at 10).  But *Rahimi* does not

establish such a such a broad exception to the Second Amendment.  It only condoned

the Government's ability "to disarm individuals who present a credible threat to the

physical safety of others."  *Rahimi*, 602 U.S. at 700.  The disarmament here is not based

on the Wysockis posing a credible threat to the safety of others nor to prevent their

misuse of firearms.  Defendants' initial firearms seizure and license revocation was not

based upon their risk to others (or their risk of misuse).  Instead, it was based on the

Wysockis' daughter's mental-health emergency and her danger to herself, based on

12

firearms owned by others.  And Defendants' ongoing refusal to return the firearms or licenses appears to be entirely arbitrary or unlawful—it is based not on any existence of mental health treatment or even current threat that the daughter poses to herself or others.  The evidence in the record is that that threat long ago dissipated (if it ever existed at all).  Yet, Defendants refuse to let the Wysockis have their firearms or licenses and have imposed a set of requirements—additional letters from mental health practitioners and the purchases of particular kinds of safes—not based on any policy or laws, but on requirements of Defendants' own-making.  While "[a]nalogical reasoning requires only that the government identify a well-established and representative historical analogue," not a "historical twin or 'dead ringer,'" *Antonyuk*, 120 F.4th at 1009–10 (quoting *Bruen*, 597 U.S. at 30), the Defendants have failed to provide any relevant analogy, historical evidence, or relevant argument at all.  Defendants' conduct is a plain violation of the Second Amendment.[7]  The Wysockis are entitled to summary judgment on that claim.  *See, e.g.*, *Higbie v. James*, 795 F. Supp. 3d 307, 340–41 (N.D.N.Y. 2025) ("Given the lack of supportive historical tradition for restricting firearm licenses to out-of-state residents and the fact that Plaintiffs are not otherwise exempt from carrying a firearm, the statute is unconstitutional as applied to Plaintiffs, who were denied and prohibited from getting a license in New York.").

---

[7] Defendants dedicate much of their brief to what amounts to counsel's musings about the reasonableness of the PLS's actions as to the Wysockis.  At issue is not whether Officer Scaglione acted unreasonably, but whether Scaglione's exercise of discretion in suspending the Wysockis' licenses and imposing obligations based on their daughter's mental health incident, is supported by history and tradition.

13

*                          *                          *

The parties do not address the interplay between New York Penal Law § 400.00 and the PLS Handbook or the validity of the seizures and revocations under the Penal Law. They just jump to the Second Amendment question. (When asked at his deposition the justification under the Penal Law for the seizure and license revocation here, Timpano could provide no answer. (*See* Dep. of Marc Timpano ("Timpano Dep."), attached to Bellantoni Decl. as Ex. 3, Dkt. No. 32-12 at 30:6-10 ("Q: [The Wysockis] haven't engaged in any conduct that would disqualify them from possessing firearm[s] or even obtaining a license, right? A: That is correct."))).

The PLS Handbook functions as a "guide for pistol license applicants and current pistol license holders in Nassau County" and a means for implementing the laws and rules governing gun licensing, namely New York Penal Law § 400.00. (PLS Handbook at 1). Chapter 1, Section I of the Handbook provides that Nassau County can revoke a license under New York Penal Law § 400.00(11). And Penal Law § 400.00(11)(b) provides that:

> [w]henever the director of community services . . . makes a report pursuant to section 9.46 of the mental hygiene law, the division of criminal justice services shall convey such information, whenever it determines that the person named in the report possesses a license issued pursuant to this section, to the appropriate licensing official, who shall issue an order suspending or revoking such license.

Here, there was no report from the division of criminal justice or other similar entity to Nassau County. Scaglione simply informed the Wysockis—based upon Dennis's self-reporting—that their pistol licenses were going to be suspended given their daughter's expressed thoughts of self-harm. In other words, it appears that Nassau County

14

revoked the Wysockis' licenses, not based upon the authority granted by § 400.00(11), but some other (unidentified or nonexistent) authority altogether. (As for the seizure and surrender of the firearms, that appears to flow from the license revocation, under Penal Law § 400.00(11)(c).)

In any event, the Wysockis' Complaint frames their lawsuit as an as-applied challenge to the PLS Handbook under the Second Amendment. And having prevailed on summary judgment on that claim they are, therefore, entitled to an injunction requiring the return of their firearms and the reinstatement of their pistol licenses.

But in their briefing, they seek further relief, to strike down and enjoin the PLS Handbook. Assuming that the challenge to the PLS Handbook is in fact a challenge to the Penal Law provision pursuant to which it is enacted—§ 400.00(11)—this facial challenge fails.[8] A facial constitutional challenge "is 'the most difficult challenge to mount successfully, because it requires [the challenger] to establish that no set of circumstances exists under which the [law] would be valid.'" *Antonyuk*, 120 F.4th at 983 (quoting *Rahimi*, 602 U.S at 693). Their briefing contains no explication of the PLS Handbook or § 400.00(11) to circumstances other than their own, and they make no argument that there is no set of circumstances where the law could be applied

---

[8] The PLS Handbook is not a law. It does not purport to be a regulation. At best it is a municipal policy or practice. But policies which operate like laws are challengeable under *Monell* which is addressed below. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978) ("Although not authorized by written law, . . . practices of state officials could well be so permanent and well settled as to constitute a custom or usage with the force of law.") (cleaned up); *Connick v. Thompson*, 563 U.S. 51, 61 (2011) ("Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law.").

consistent with the Second Amendment.  The Wysockis rely only on their own experience and general assertions that the Nassau policies are unconstitutional.  (*See* Pls.' Mot. at 9).

The Court cannot, therefore, rule out that at least "in some of its applications," Penal Law § 400.00(11), as implemented by the PLS Handbook, is consistent with the Second Amendment.  *See, e.g.*, *Giambalvo v. Suffolk County*, 155 F.4th 163, 182 (2d Cir. 2025) (finding plaintiffs were unlikely to succeed in a facial challenge to New York State's requirement that applicants take a firearms training course where they failed to "plausibly allege[] that *all* training courses within New York State are so costly" so as to constitute an "exorbitant fee" subject to constitutional challenge).

## II.    *Monell* Liability

Under *Monell*, a municipality may be held liable under § 1983 if the deprivation of the plaintiff's constitutional rights "is caused by a governmental custom, policy, or usage of the municipality."  *Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. 2012).  "The elements of a *Monell* claim are (1) a municipal policy or custom that (2) causes the plaintiff to be subjected to (3) the deprivation of a constitutional right."  *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 97 (2d Cir. 2020).  *Monell* prohibits *respondeat superior* liability for municipalities, "meaning that a plaintiff must demonstrate that through its *deliberate* conduct, the municipality was the moving force behind the injury alleged."  *Id.* at 98 (quotation omitted).  A plaintiff may establish the existence of a municipal policy giving rise to *Monell* liability in four different ways:

> (1) a formal policy endorsed by the municipality; (2) actions directed by the government's authorized decisionmakers or those who establish

governmental policy; (3) a persistent and widespread practice that amounts to a custom of which policymakers must have been aware; or (4) a constitutional violation resulting from policymakers' failure to train municipal employees.

*Deferio v. City of Syracuse*, 770 F. App'x 587, 589–90 (2d Cir. 2019) (quotations and citations omitted).

The Wysockis contend that the County has a policy of "disarming law-abiding individuals based on the conduct, events, and/or mental health condition of a cohabitant." (Pls.' Mot. at 1). They argue that under this policy, Defendants will only reinstate licenses and return firearms when they "feel better about the safety of the home." (*Id.*). But they have failed to show that such a policy exists.[9]

Though they point to the PLS Handbook to support their *Monell* claim, (Pls.' Mot. at 11), the Handbook does not embody or memorialize such a policy. In fact, it appears Defendants—in seizing the Wysockis' firearms (or requiring their surrender) and creating new barriers to their return (and for the reinstatement of their licenses)—have acted entirely outside of the PLS Handbook. The PLS Handbook requires a *licensee* to report to the PLS when the "licensee or a member of the licensee's household receives professional treatment for mental health issues (including depression)" or is admitted to a hospital for mental-health treatment. (PLS Handbook, Ch. 2 §§ F(13)–(14)). It stops there. The Handbook does not provide that upon such a report, an officer may or must revoke a license, seize firearms, or require their surrender. (Nor does the Penal Law—

---

[9] At times the briefing changes the definition of the challenged policy. For example, on occasion the Wysockis frame the policy more broadly, as "suspending a pistol license and confiscating *all* guns based on a cohabitant's conduct and/or condition." (Pls.' Mot. at 11).

which only provides that authority to revoke a license upon a report from a state official or designee, not the licensee or a member of the public, *supra* p. 14.)[10]

Nor have the Wysockis established that there is a general practice to interpret or implement the Handbook in the way it was implemented against them.  They contend that "there is no question that whenever a licensee resides with an individual who expresses suicidal thoughts, the pistol license of every resident is suspended."  (Pls.' Mot. at 5).  The Wysockis repeatedly cite to the testimony of Scaglione and Timpano to demonstrate there is such a policy.  (*See, e.g.*, Pls.' Reply at 12–13).  But this testimony is hardly as definitive as the Wysockis suggest, and certainly insufficient to sustain a *Monell* claim.

When asked whether it was a PLS practice to suspend a license based on a cohabitant's mental health issues, Scaglione testified that it "has happened" and that it "could happen."  (Scaglione Dep. at 60:8–62:9).  When he spoke more definitely, he was only doing so hypothetically.  He admitted that he could not "speak for all . . . mental health issues," and speculated that "if someone is suicidal in that household or threatens suicide, yes, we'd be taking guns from that home," based on his understanding of his authority.  (*Id.* at 63:14-21).  To be sure, he could not imagine or come up with a scenario where he would not suspend a license.  (*Id.* at 117:14-24).  Even substituting speculation and hypothesis for past practice or examples from other cases,

---

[10] Defendants do not dispute the Wysockis themselves committed no act warranting disarmament, nor any of the enumerated bases for suspension in the Handbook.  (Pls.' 56.1 Stmt. ¶¶ 73–74; *see also* Timpano Dep. at 30:6-17 (agreeing the Wysockis did not engage in any conduct that would disqualify them from possessing firearms or obtaining a license)).

it does not establish much.  Scaglione is but one officer, and he is not a policy-maker—

his testimony is insufficient to establish a municipal policy.  *See Agosto*, 982 F.3d at 98

(rejecting plaintiff's argument that one official's individual actions represent official

policy given that the official was not someone "whose edicts or acts may fairly be said

to represent official policy for the entire municipality" (quotation omitted)).

Timpano's testimony is similarly unhelpful.  While Timpano testified that

reporting incidents could lead to the suspension of a license, he did not testify to any

widespread practice or policy requiring disarmament in such circumstances.  (Timpano

Dep. at 16:5-12 (testifying that a reportable incident could lead to a suspension)).

Neither Timpano nor Scaglione were asked—at least in anything presented to the

Court—about other incidents of firearm seizures or license revocations in the County.

Nor, as far as the Court can tell, was any discovery propounded or received on such

incidents.  As a result, aside from their own experience, the Wysockis provide no other

evidence that such a deprivation has occurred to someone else or that the Handbook

has been used and applied to others in a similar manner.  (*See* Pls.' Mot. at 11 (pointing

only to enforcement of the challenged policies as against the Wysockis)).  And as such,

they are not entitled to summary judgment.[11]  *See O'Leary v. City of New York*, No. 24-

---

[11] The Wysockis contend that the same type of policy was found to violate the Second Amendment in *Milau v. Suffolk County*, No. 17-CV-6061, 2025 WL 1029394 (E.D.N.Y. Feb. 13, 2025), *report and recommendation adopted*, 2025 WL 957533 (Mar. 31, 2025).  In *Milau*, there was "a formal written policy [that] prohibited Plaintiff from possessing a pistol license," bolstered by the testimony of multiple Suffolk County employees as to the policy's existence.  *Id.* at *11.  There is no such similar policy evidence here.

19

2710, 2025 WL 1554327, at *1 (2d Cir. June 2, 2025) ("[I]solated acts by non-policymaking municipal employees are generally not sufficient to demonstrate a municipal custom, policy, or usage that would justify liability" (quoting *Hu v. City of New York*, 927 F.3d 81, 106 (2d Cir. 2019)); *e.g.*, *Connelly v. City of St. Albans*, No. 21-CV-0291, 2024 WL 1976658, at *16–*17 (D. Vt. May 3, 2024) (denying plaintiff summary judgment on *Monell* claim, in part, because she presented no other evidence of the unlawful conduct besides her own experience and a few dissimilar incidents by the same officer).[12]

## CONCLUSION

For all of these reasons, the Wysockis' motion for summary judgment is granted as to their claim for violation of the Second Amendment under § 1983 but denied as to their *Monell* claim. They are entitled to an injunction requiring return of their firearms and reinstatement of their licenses. However, entry of such injunction must wait until entry of final judgment, absent a motion under Federal Rule of Civil Procedure 54(b), in

---

[12] To the extent the Wysockis take issue with the discretion bestowed to officers by the PLS Handbook, such discretion on its own does not render the Handbook a facially unconstitutional policy. *Cf. Antonyuk*, 120 F.4th at 976 ("[A]lthough it is possible that a licensing officer *could* make an unconstitutional demand for information pursuant to [the broad discretion in a licensing provision], we cannot conclude that there are *no* questions a licensing officer might constitutionally ask an applicant under that provision").

light of the remaining claims for trial: the Fourth Amendment and *Monell* claims.[13]  The

parties are directed to file a joint pretrial order by **August 21, 2026.**

SO ORDERED.

*/s/ Sanket J. Bulsara*
SANKET J. BULSARA
United States District Judge

Date:  July 7, 2026
          Central Islip, New York

---

[13] Defendants waived their ability to seek summary judgment.  Though they previously indicated they may file a cross-motion, (Status Report dated July 14, 2025, Dkt. No. 29), no cross-motion was served, (*see* Defs.' Opp'n).  While the *Monell* claim is proceeding to trial, the Wysockis should consider whether the evidence they have for this claim—which is plainly insufficient and nonexistent to achieve summary judgment—would be sufficient to meet their burden at trial.